Argued at Pendleton November 1, 1922, modified January 9, 1923.

# DE WOLFE *v.* KUPERS.

(211 Pac. 927.)

**Landlord and Tenant—Reserving Part of Crop as Rent Makes Landlord and Tenant Tenants in Common of Crop.**

1. Reserving as rent an aliquot part of the crop makes the landlord and tenant tenants in common of the crop.

**Reformation of Instruments—Evidence Held to Show Only Three Fifths, not Whole, of Crop Intended to be Transferred.**

2. Where, on assignment by insolvent lessee of lease of farm for term of years, under which the rental was two-fifths of the crop, and transfer to assignee of personal property, bought from the land-

lord, it developed that lessee had no bill of sale from the landlord, and it was arranged that landlord should execute a bill of sale direct to the assignee, evidence *held* to show, as respects the issue of reformation of such bill of sale, that, although it referred to the entire crop on the leased premises, it was meant to transfer only the three fifths of the crop which the lessee owned, and also to show that the landlord was not negligent in failing to read the bill of sale, which was drawn for the parties by a bank cashier, to whom all the parties applied for that purpose.

**Landlord and Tenant—Lease of Farm Excepting Dwelling Construed —"Farm Land."**

3. Where lease of 755-acre farm expressly included all the "farm land" belonging to the farm and "all the buildings," but excepted and reserved to landlord's use the dwelling, *held,* that, since exceptions are strictly construed, the landlord's rights would be restricted to the dwelling-house alone, and a parallelogram of land extending 50 feet on all sides thereof and to the highway, and would not include any other part of the two-acre inclosure in which the dwelling was situated, such as other buildings and a well in the inclosure, and that, as to the well, the only source of water supply on the ranch, the parties would be tenants in common; for "farm land" does not necessarily mean merely land which has been plowed, but would naturally be interpreted to cover all the land contained in the farm.

**Landlord and Tenant—Tenant must Repair, but may Remove Improvements.**

4. The duty of repair of leased premises in the absence of other agreement is imposed on the tenant, and the tenant is presumed to repair and improve for his own benefit, and his right to the result of his labor expended for that purpose is to reap the enhanced benefit during the term, and, within certain limitations, to remove the improvements before its expiration.

**Evidence—Additional Terms not to be Ingrafted on Unambiguous Lease.**

5. Where a lease of farm excepted nothing except the residence thereon, the landlord could not ingraft thereon, by parol, provisions allowing him to keep any stock on the premises or to use any of the buildings, except the residence, for any purposes, in view of Section 713, Or. L., relating to parol evidence.

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.

MODIFIED.

For appellant there was a brief over the names of *Messrs. Raley, Raley & Steiwer,* and *Mr. H. J. Warner,* with an oral argument by *Mr. J. H. Raley.*

For respondent there was a brief over the name of *Messrs. Peterson, Bishop & Clark,* with an oral argument by *Mr. Will M. Peterson.*

BURNETT, J.—The defendant is the owner of a tract of land in Umatilla County of about 755 acres, described by legal subdivisions in the complaint and said to be, as admitted by the answer, "generally known as and described as the Carl Kupers farm near Helix, Oregon." On June 3, 1920, the defendant entered into a written agreement with Theo Charrier, which they both signed and sealed on that date, and which reads as follows, omitting the attestation clause:

"This indenture made this 3d day of June, 1920, between Carl Kupers of Helix, Umatilla County, Oregon, party of the first part, and Theo. Charrier of Helix, Umatilla County, Oregon, party of the second part,

"Witnesseth: That the said Carl Kupers, for and in consideration of the rental hereafter mentioned, leases and to farm let, to the said Theo. Charrier, all the farm land belonging to the farm known as the Carl Kupers farm, near Helix, Umatilla County, Oregon, containing 755 acres more or less, together with all the buildings, with the exception of the dwelling, which party of the first part reserves for his own use, to have and to hold the same unto the said Theo. Charrier, from the 4th day of June, 1920, to the first day of March, 1927, but it is understood and agreed upon that this lease will expire and terminate on the land east of the railroad track the first day of March, 1926, party of the second part is to pay as rental two-fifths of all the grain and hay grown on the said land, delivered at the warehouse or on board of car."

At the same time Kupers sold to Charrier a lot of horses and mules and various agricultural imple-

ments used for farming the land mentioned. In purchasing those articles Charrier incurred a large indebtedness to Kupers. He was also indebted to a bank at Helix, Umatilla County, Oregon.

Charrier was the tenant of another farm in the neighborhood, upon which he resided while he farmed both it and the Kupers farm. Becoming financially involved, he sought to sell both leases and the livestock and tools connected therewith, and to that end employed a real estate broker to effect a sale for him. The broker through an associate at Walla Walla, Washington, got in touch with the plaintiff. After some negotiations, the latter offered $17,000 for Charrier's lease of the Kupers farm and for the livestock and tools which had been purchased from Kupers. All of the negotiations respecting the transfer of Charrier's interests were had with Charrier and the real estate agents, and Kupers appears not to have had anything to do with the transaction until the day when the papers involved were executed. For that purpose the parties repaired to the bank at Helix and, Charrier, Kupers and De Wolfe being present, they engaged the cashier of the bank to write the necessary transfer. To the lease already quoted were then and there appended the following writings signed by Kupers and De Wolfe respectively:

"I, the undersigned, hereby consent to the transfer of this lease from Theo. Charrier to H. L. De Wolfe, and hereby extend this lease three years or to March 1, 1930.

"Dated at Helix, Ore., Oct. 20, 1921.

"Carl Kupers."

"I, the undersigned, hereby accept all terms of the above written lease and agree to carry out all its terms.

"Dated at Helix, Ore., Oct. 20, 1921.

"H. L. De Wolfe."

There is no dispute as to the terms of the lease or the appended writings just mentioned. When the cashier was about to draw up the bill of sale for the livestock and implements, it was suggested by Charrier and assented to by the other parties, Kupers and De Wolfe, that inasmuch as Charrier had no bill of sale from Kupers, the latter should execute such a document direct to De Wolfe, who should pay $17,000 to Kupers to be applied on the indebtedness of Charrier to the bank and on the amount owing to Kupers, thus saving the execution of another bill of sale to complete the written chain of title.

De Wolfe claims that in all the negotiations the brokers represented to him that the entire crop on about 340 acres of the Kupers farm was included in the sale, and the reference thereto appears in the bill of sale, ending the list of property, thus:

"Seeded crop SE. ¼, section 21, NE. ¼, section 28, also part in NW. ¼, section 27, Twp. 5 N., R. 33, E. W. M., about 340 acres in all, or that seeded crop now on what is known as Carl Kupers ranch."

For some months after the transfer De Wolfe did not reside on the Kupers ranch. However, having removed from Walla Walla, he took actual personal possession of the property about March, 1922. It seems that friction immediately arose between the landlord and the new tenant, and the latter commenced this suit against the former, reciting the purchase of the lease and the personal property, complaining in substance that the defendant insisted upon keeping his own stock in the barn and on the premises and threatened to tear down a bunkhouse which the plaintiff had erected, to cut off his supply of water from the only source on the premises, to interfere with the electric lights which were installed,

and otherwise to prejudice plaintiff's possession and use of the leased property. He prayed for an injunction preventing the defendant from so doing, and from interfering with his enjoyment of the lease.

1. The answer admits the execution of the lease and the appended writings, but attempts to set up some private understanding with Charrier permitting the defendant to keep a limited amount of livestock on the place and to keep the defendant's automobile in the machine shed thereon, etc. As to the bill of sale, the answer avers that by the mutual mistake of the parties the entire seeded crop was included, whereas it was only intended by both parties to include Charrier's interest therein, amounting to three fifths thereof, and that the mistake, being mutual, was not the result of the negligence of the defendant. This is challenged by the reply. The evidence discloses that the whole transaction was designed to transfer Charrier's interests to De Wolfe. In other words, De Wolfe was to be substituted to the rights and liabilities of Charrier. De Wolfe knew the conditions of the lease. In fact, he expressly, according to his appended writing, accepted and agreed to carry out all its terms. Reserving as rent an aliquot part of the crop made the landlord and the tenant tenants in common of the crop: *Cooper* v. *McGrew,* 8 Or. 327; *Messinger* v. *Union Warehouse Co.,* 39 Or. 546 (65 Pac. 808); *Abernethy* v. *Uhlman,* 52 Or. 359 (93 Pac. 936, 97 Pac. 540); *Halsey* v. *Simmons,* 85 Or. 324 (166 Pac. 944, L. R. A. 1918A, 321). It was well known, therefore, to the plaintiff from his knowledge of the lease that the only interest Charrier had in the crop was three fifths. All of the witnesses who speak on the subject, including the cashier, Charrier and Kupers, with

the plaintiff only as an exception, say that it was clearly stated when the transaction was closed that all that was to be included in the bill of sale as to the crop was an undivided three fifths thereof. The only party in fact selling was Charrier. Kupers had no intention of selling anything. He did not employ the brokers to effect the sale. Even had they made the statement to De Wolfe that the whole crop went with the sale, it could not have bound Kupers, because the brokers were not his agents and had no authority to speak for him. Although it is true that Kupers signed the bill of sale, yet it is undisputed that it was a mere matter of convenience to save the execution of an additional bill of sale from Kupers to Charrier and that really Kupers was only the conduit by which the title was transferred from Charrier to De Wolfe and the money applied to the liquidation of Charrier's debts. It is incomprehensible in view of the great weight of the testimony and the writing by which De Wolfe accepted and agreed to carry out the terms of the lease, how he could have understood that he was getting the entire crop, since Charrier, from whom he bought, owned only three fifths of it. It is not at all likely that a man would in one breath buy all of the crop and in the next, agree, as he has written, to pay two fifths of it to the landlord.

2. A careful reading of the testimony makes it clearly to appear that the actual intention of the parties was to transfer to De Wolfe only three fifths of the crop then growing on the premises.

The principal obstacle to the correction of the mistake is the rule that equity will not relieve from the consequences of a mistake one who has been guilty of negligence in making that mistake. The plaintiff

claims that Kupers was present when the writing was drawn up, could have read it if he would, and that his failure to do so was *per se* negligence. Negligence is always a question of fact and each case must depend upon its own circumstances. The parties involved applied by common consent to the cashier to act as scrivener and he was known, according to the evidence, to be a man competent for that purpose. It would seem that in so doing they all acted as reasonably prudent men would under like circumstances, and they all had a right to rely upon the ability of the cashier accurately to express their statements. With the exception as stated, of the plaintiff himself, all present or in any way connected with the transaction say that only three fifths of the crop was to be transferred. The matter of negligence as affecting a mistake is discussed at length by Mr. Justice HARRIS in *Welch* v. *Johnson,* 93 Or. 591, 601 (183 Pac. 776, 184 Pac. 280), where it is said:

"Nor is the failure of a complainant to read an instrument conclusive evidence, as a matter of law, that the mistake was due to his negligence."

If we could draw the conclusion from the evidence that the plaintiff in fact understood that he was buying the entire crop, it might be required that the relief should take the shape of a mere cancellation of the agreement, in which case it would be incumbent upon the party complaining to restore or tender to the other what he had received in the exchange; in other words, both parties should be put in the same position in which they were before the transaction was had. But, as before mentioned, the testimony does not warrant such a conclusion. It is very plain that in agreeing to carry out the terms of the lease

on being shown the conditions of that document, supported as it is by the testimony of all others connected with the matter, the plaintiff thoroughly understood that he was getting only three fifths of the crop. In short, the evidence does not present a case for cancellation of the instrument. And since it is so plain that there was a mistake we cannot say that any of the contracting parties acted otherwise than as reasonably prudent men would act under like circumstances.

Adverting to the doctrine stated in *Howard* v. *Tettelbaum,* 61 Or. 144 (120 Pac. 373), the negligence, if any, of Kupers, was not so gross and inexcusable as to amount to a positive violation of a legal duty on his part. If Kupers had done any act or said any word, or authorized it to be said or done, leading De Wolfe to believe that he was getting all of the crop, it might be said that his negligence was so gross as to prevent Kupers from correcting the mistake, but nothing of that kind appears in testimony. The only peg upon which De Wolfe can hang his contention that he was to get all of the crop was the statements which he attributes to the real estate agents, and they are denied by those agents as well as all others who have spoken on the subject. The mistake should be corrected and the instrument reformed.

3. The adjustment of the rights of the parties as to the occupancy of the premises under the lease involves somewhat more of difficulty. According to the evidence, there is on the premises a large country residence fronting on a main highway which passes through the premises. North of it is a large barn surrounded by a fence, also bordering on the highway. The residence spoken of is within an irregular inclosure containing about two acres. In this same

inclosure are other buildings, situated there at the time the lease was drawn. For instance, there was a tenant's house which we infer was the former residence of Kupers before he built the principal dwelling. There is a well with a windmill, and this well is the only source of water supply on the whole ranch. The windmill is supplemented by an electric motor used in pumping water. Across the road from the principal residence is a machine shed in which Kupers claimed the right to keep his automobile. The well and windmill are situated on the northern boundary of the inclosure surrounding the dwelling. Immediately on the other side of the fence between this inclosure and the barnyard is a large watering trough for the purpose of watering stock. De Wolfe built within the inclosure a bunkhouse in which the employees engaged in the work of farming were to sleep.

It is a rule of common acceptation that the conveyance or lease of real property includes all that is appurtenant and necessary to the convenient use and occupancy thereof. It is also a principle well established, as stated in Jones on Landlord and Tenant, Section 63, that an exception is part of the thing granted. Likewise it is a rule of construction that "every exception or reservation in the deed is the act of the grantor and should therefore be construed most strictly against him and most beneficially for the tenant": *Wyman* v. *Farrar,* 35 Me. 64, 71. Let us apply these principles to the construction of the lease, using the testimony as a light to aid us in our quest. According to the document, it treats of a farm "known as the Carl Kupers farm." That term includes not only all of the farm land belonging to the farm, but also all of the buildings,

with the exception of the dwelling. Here was an agricultural plant, so to speak. The testimony shows that the defendant resided upon the place and farmed it during a course of years. It grew to be known as the Kupers farm. It is presumed that, excepting as it does only the dwelling, there were no other exceptions intended. The "farm land" does not necessarily mean merely land which had been plowed. One would naturally infer that all of the land included in what is known as "the Carl Kupers farm" was reasonably necessary for the convenient operation of that agricultural plant. It is not apparent how a "farm" would contain any but "farm land." If this be not true, what was the necessity of excepting the residence? It is readily to be seen that so large a ranch cannot successfully be farmed without having stock and farm buildings and places in which to keep tools and animals necessary for the conduct of the farm. It is also requisite to have convenient structures in which the tenant and his laborers may live, so that we may reasonably conclude from a fair construction of the language of the lease that the whole farm was included, "with the exception of the dwelling."

Still another circumstance must be taken into consideration. The dwelling and at least some of the other buildings are in the same inclosure, so that all other things being equal, there would be included in that term of "all the buildings," in favor of the tenant, the use of a reasonable space of ground around such buildings convenient for the use thereof. But the balance is affected by the principle that the grant must be most strictly construed against the grantor, with the result that when he makes only an exception of the dwelling that is a part of the farm itself, the

conclusion must be drawn favorable to the tenant or the grantee, that the exception of the dwelling was the only part of the whole plant which the landlord reserved. Since this is true, the tenant has the paramount right in the inclosure surrounding the buildings, part of which he is entitled to use.

It is conceded in the pleadings and is true as a matter of law that the reservation of the residence would naturally carry with it the use of sufficient ground adjacent thereto to enable the lessor conveniently to enjoy it; and it is likewise true as affecting both the landlord and the tenant that the grant of all the other buildings, as well as the reservation of the dwelling, would carry with it the appurtenance of the well, that being the only source of supply of water on the premises. Really, in the use of the well the parties are in effect tenants in common thereof and each is entitled to use it according to his reasonable necessity connected with the occupancy of the premises. The tenant is entitled to use not only the windmill but also the electric motor to pump the water necessary for his use, but the landlord is not bound to furnish the power required to operate the motor.

4. The duty of repair of leased premises in the absence of any other agreement upon the subject is imposed upon the tenant, and, as said in *Gocio v. Day,* 51 Ark. 46 (9 S. W. 433):

"The tenant is presumed to repair and improve for his own benefit; and his right to the result of his labor expended for that purpose is to reap the enhanced benefit during the term, and, within certain limitations, to remove the improvements before its expiration."

It seems reasonable that the tenant is entitled to erect upon the leased premises such structures as are

fairly necessary to enable him to enjoy his term and to carry out his contract of leasing. When the premises were leased, the electric lights were installed not only in the residence but in the barn as well, and perhaps in the tenant's house. At any rate, the wires and lights, being thus established, were fixtures appurtenant to those buildings, and the tenant is entitled to use them; and so far as they are beneficial to the residence itself, the landlord has a right to use them there. In effect, as in the use of the well, the landlord and the tenant are tenants in common of the lighting system.

5. Under the terms of the lease Kupers has no right to engraft thereon provisions allowing him to keep any stock on the premises or to use any of the buildings for any purpose, except the residence. The statute is clear on that subject. See Section 713, Or. L., reading thus:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:—

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section 717, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

The Circuit Court was right in correcting the bill of sale so as to show that only three fifths of the

growing crop was conveyed to the plaintiff here; but it was in error in requiring the tenant to remove the bunkhouse. It was likewise wrong in including the whole two acres as the curtilage of the dwelling-house reserved. So far as we are able to determine from the testimony, a parallelogram extending fifty feet north, west and south from the residence and with that width to the highway on the east, is sufficient space about the residence for the convenient use thereof. The decree will be modified so as to allow the defendant the exclusive use of that parallelogram, together with the use in common with the plaintiff of the water system and the lighting plant, and the defendant will be enjoined from interfering in any way with the plaintiff's rights under the lease as herein construed. For want of properly framed pleadings as well as evidence on the subject, we cannot decree how much water or light each party is entitled to use, or how much of the necessary expense each party shall pay. A decree covering those features would be in effect one in partition and not within the issues formed by the present pleadings. The solution of those questions must be left to the parties, who can either negotiate in a common-sense, practical manner or carry on further litigation.

Neither party will be allowed to recover costs or disbursements in this suit, either in this court or in the Circuit Court.                    Modified.