In re John David SUMNER, aka John Sumner, Debtor.

Bankruptcy No. 386–01566.

United States Bankruptcy Court, D. Oregon.

Sept. 23, 1986.

Laura Walker of Hill, Huston & Ferris, Portland, Or., for debtor.

Brant M. Medonich of Mautz & Hallman, Pendleton, Or., for creditor IPCA.

ELIZABETH L. PERRIS, Bankruptcy Judge.

This matter arises upon the Debtor's motion for use of cash collateral. In order to rule on the motion, the Court must first resolve what constitutes cash collateral. Pursuant to the stipulation of the parties, the scope and extent of IPCA's (Interstate Production Credit Association) security interest will be resolved in connection with the motion for use of cash collateral rather than in a separate adversary proceeding.

## FACTUAL BACKGROUND

In December, 1984 the Debtor granted IPCA a security interest in crops, all pay-

ments made as a result of an acreage allotment or set aside program which results in the Debtor's not planting a crop, and the proceeds therefrom. IPCA perfected the security interest by filing a financing· statement in 1980, a continuation statement in 1985 and an amendment in 1985. The Debtor also granted IPCA a mortgage on his real property. The mortgage includes a provision giving IPCA an interest in the rents and profits from the land in the event Debtor is in default on his obligation to IPCA. The Debtor owes IPCA approximately $96,000 plus attorney's fees and costs.

For several years prior to the time the Debtor filed bankruptcy on April 1, 1986, the Debtor's primary involvement in farming was as a lessor of his farm land to Mr. and Mrs. McElligott. Under the terms of the McElligott lease, the Debtor is entitled to receive one-third of the crops which McElligott produces on Debtor's land and one-third of any government farm program payments related to the leased property. The lease recently terminated by its terms.

The funds at issue in this matter are derived from the Debtor's share of crops, and from government programs, some of which are related and some of which are unrelated to the lease. The proceeds related to the lease include $40,991 in proceeds from the one-third share of the 1985 crop, the 1986 crop proceeds which will be received in the future, a $3,703 crop storage payment, a $600 diversion payment and a $12,000 deficiency payment. The funds unrelated to the lease are $15,000 in proceeds from the Agricultural Conservation Program ("ACP") and $24,700 in proceeds from the Conservation Reserve Program ("CRP").

## LEGAL ANALYSIS

I. The Debtor's share in crops and government program payments arising under the lease are subject to Article 9 of the Uniform Commercial Code.

■ The initial question which the Court must address is whether IPCA's security interest in the Debtor's interest in the crops and government programs arising as a result of the lease is within the scope of Article 9 of the UCC. The Debtor contends that the funds he derives from the McElligott lease are rents and are therefore excluded from the scope of Article 9 by ORS 79.1040(10). IPCA, relying on the case of *In re Sabre Farms*, 27 B.R. 532 (Bankr.Or. 1982), argues that rents are property subject to ORS Chapter 79. The *Sabre Farms* case holds that the right to receive rent from a lease is a general intangible. The *Sabre Farms* opinion contains no discussion of the rent exclusion contained in ORS 79.1040(10). It appears that the exclusion of rents contained in that section was overlooked by the parties and the Court. For that reason, the *Sabre Farms* opinion does not resolve the rents issue presented in this case.

■ Initially, one must consider the nature of the Debtor's interest in the crops and government programs pursuant to the lease. Under Paragraph 2 and Paragraph 8 of the lease, the Debtor owns one-third of the crops and government program payments. The McElligotts did not merely promise to pay the Debtor one-third of the proceeds of each. This arrangement is consistent with Oregon law which provides that a crop share lease gives both the lessor and the lessee an undivided interest in the crops. *Halsey v. Simmons*, 85 Or. 324, 166 P. 944 (1917); *DeWolfe v. Kupers*, 106 Or. 176, 211 P. 927 (1923). Likewise, when the Debtor and the McElligotts signed up to participate in the government programs they both signed up. Thus, the Debtor has a direct ownership interest in both the crops and the government program payments.

A. Crop share.

■ Looking first at the crops, according to ORS 79.1050(1)(h), crops are goods. ORS 79.1020 provides that Article 9 applies to any transaction intended to create a security interest in personal property or fixtures including goods.

The Court finds unpersuasive the Debtor's argument that only crops which are farm products are subject to Article 9. In order for crops to be farm products, they must be in the possession of a debtor engaged in farming. While it may be argued that Mr. Sumner is not a debtor engaged in farming, it is irrelevant to the issues presented in this case. ORS 79.2030(1)(a), 79.4010(1)(b) and 79.4020(1) and (3) deal with creation and perfection of a security interest in crops. None of these provisions require that a debtor be engaged in farming in order to grant a security interest in crops. The significance of the occupational status the Debtor granting a security interest in crops is as to whether a buyer of the crops takes free of a security interest. ORS 79.3070.

The Court has found several authorities which agree that crops are goods and cannot fall within the Article 9 exclusion afforded by ORS 79.1040(10). In discussing the extent Article 9 applies to realty interests, Summers and White state:

> there are several exceptions to the general principle that Article Nine does not apply to realty interests. * * * Crops are also 'close' to realty. According to 2–107 and 9–105(h), crops are goods. To create a security interest in crops, the parties must comply with Article Nine rules on creation and perfection. A real estate mortgagee cannot subject crops to his mortgage, merely by complying with real estate mortgage law. White & Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 22–6 at 890 (2nd. Ed.1980).

See also Hawkland, *UCC Series*, V. 8 § 9–104: 11 p. 141–142; and, Alderman, *A Transactional Guide to the Uniform Commercial Code*, Vol. 2 p. 892–893 (2nd. Ed.1983).

The only case of which the Court is aware that discusses whether UCC § 9–104(j), which is codified in Oregon as ORS 79.1040(10), can result in exclusion of a security interest in crops, holds that an interest in crops is subject to Article 9 even though it is derived from a real estate transaction. *U.S.A. v. Newcomb*, 682 F.2d 758 (8th Cir.1982). All of the cases cited by the trustee involve cash rental arrangements and are therefore factually distinguishable.

The $40,991 in proceeds from the Debtor's share of the 1985 crop is covered by the IPCA's pre-petition security interest in crops and proceeds therefrom. The Debtor's interest in the 1986 crop is also covered by the IPCA's pre-petition security interest in crops. Since the 1986 crop was planted before the Debtor filed his case, § 552(a)[1] is not applicable.

B. Government program payments related to the lease.

■ In considering the diversion, deficiency and crop storage program proceeds which the Debtor acquired an interest in pursuant to the lease, it is significant that the Debtor is a direct participant in the programs. The fact that the Debtor participated jointly with someone who was farming his land does not convert the Debtor's rights under the programs to rent for purposes of the UCC Article 9 exclusion provision. It is interesting to note that the documents submitted to the Court regarding the Debtor's participation in the government programs refer to the Debtor as a producer. See Exhibit A to Debtor's Supplemental Memo filed July 21, 1986 and Exhibit B–4 to the Motion and Affidavit filed by the Debtor on June 17, 1986. Since the Debtor has a direct contractual interest in the government programs, the character of program payment under the UCC must be determined by reference to the appropriate UCC Article 9 provision.

Turning now to the extent of IPCA's security interest in the specific government program payments related to the lease.

■ 1. The $3,703.11 in crop storage payments are based on a contract between the Debtor and ASCS relating to wheat harvested in 1983 whereby the Debtor agreed to keep grain stored on his farm in

---

1. All statutory references are to the Bankruptcy    Code (11 U.S.C.) unless otherwise indicated.

storage for an additional year. In order to participate in the storage program, the Debtor had to participate in the 1983 version of the set aside program. IPCA argues that it has a perfected security interest in all accounts, contract rights and governmental entitlement programs. I find this argument unpersuasive. The security documents limit IPCA's interest in accounts and contract rights to those arising from the sale or disposition of the Debtor's chattels. The documents limit IPCA's interest in proceeds of government entitlement programs to proceeds of any government set aside program or acreage allotment which results in the Debtor not planting a crop. The fact that participation in the set aside program is a prerequisite to participation in the grain storage program does not make the proceeds of the grain storage proceeds of a set aside program. The IPCA chose to limit its security interest to proceeds of the set aside program rather than taking an interest in any proceeds of government programs related to set aside programs. As pointed out by the Court in *In re Miguel*, 30 B.R. 896, 898 (Bankr.E.D.Cal.1983), "[t]hough the interpretation of the description of collateral in a financing statement is liberally construed, when the secured party elects to give notice of a more limited type of collateral, they put potential creditors on notice only as to the limited description." *Id.* Likewise, the storage payments are not proceeds of the crop in storage. *In re Connelly*, 41 B.R. 217, 38 UCC Rptr.Serv. 1730 (Bankr.D.Minn.1984). Since I have found that IPCA does not have a perfected security interest in the storage payments, I will not address the § 552(a) argument raised by Debtor.

■ 2. *Deficiency Program.* The deficiency program is one whereby the government pays a farmer the difference between the target price for the commodity and the loan or market rate, whichever is lower. In essence, the program pays the farmer a subsidy on crops actually planted. IPCA argues that the deficiency payments are proceeds of the Debtor's pre-petition interest in the crops and are therefore within the scope of its security interest. In the alternative, IPCA argues that it has a security interest in the deficiency payments based upon the provision in its mortgage allowing it to reach issues and profits from the land in the event of the Debtor's default. The Debtor argues that he did not have a pre-petition interest in crops and therefore the deficiency payments cannot be characterized as proceeds. The Debtor further argues that since he did not sign up for the 1986 deficiency payment until after he filed Chapter 11, he had no rights in the deficiency payment and IPCA's lien is cut off under § 552(a). Finally, the Debtor argues that the IPCA mortgage provision relating to profits and issue is not broad enough to cover the deficiency payments, and, even if it were, IPCA has no right to profits because it failed to perfect its interest.

The Court agrees with IPCA that the deficiency payments are proceeds of the Debtor's interest in the 1985–1986 crop. As pointed out in *In re Kruse*, 35 B.R. 958, 965 (Bankr.D.Kan.1983), "subsidy payments made to supplement a planted crop are ... proceeds of the planted crop under the Uniform Commercial Code and subject to a creditor's security interest in the crops out of which the payments arose." The interest in proceeds is valid despite the fact that they are received post bankruptcy to the extent that the payments relate to crops planted pre-bankruptcy. § 552(b). It appears from the record before this Court that all crops were planted pre-bankruptcy.

■ 3. *Diversion Program.* After the Debtor filed Chapter 11, he signed up for the diversion program. Under the terms of the program, the Debtor and the McElligotts jointly agreed not to plant wheat on a certain number of acres. They had the option, of which they availed themselves, to plant barley on the diverted acres. The IPCA claims that its security interest extends to diversion program proceeds for the same reasons it asserted in connection with the deficiency program. The Debtor

asserts that his rights under the diversion program are after acquired property under § 552(a).

Diversion program entitlements are general intangibles, contract rights or accounts, not proceeds of crops. *In re Kruse*, 35 B.R. 958; *In re Lions Farms, Inc.*, 54 B.R. 241 (Bankr.D.Kan.1985). The fact that the farmer is permitted to plant an alternative crop on diverted acres is irrelevant. Diversion payments are paid for not growing wheat. Since the farmer is not required to grow an alternative crop, the diversion payment is not a subsidy for growing the alternative crop.

Debtor signed the contract whereby he agreed to participate in the diversion program after he filed Chapter 11. "Once a bankruptcy petition is filed, Section 552 'abrogates the effect of all pre-petition security interests in subsequently acquired property except those security interests in proceeds to the extent recognized by applicable law.'" *In re Lorenz*, 57 B.R. 734, 736 (Bankr.N.D.Ill.1986). IPCA has not met its burden of demonstrating that the Debtor's interest in the diversion program contract is proceeds or otherwise fits within the scope of § 552(b). Although the acres which were ultimately part of the diversion program were planted with barley rather than wheat pre-petition, that planting arrangement did not give the Debtor any rights under the diversion program. The Debtor's contract rights under the diversion program arose post petition and are therefore not part of IPCA's security.

**II. The proceeds from the Debtor's participation in the CRP and ACP are post petition assets and are not IPCA collateral.**

■ The ACP and CRP programs compensate participants for setting aside certain acres and following specified conservation practices. The Debtor entered into contracts to participate in the two programs after he filed Chapter 11. IPCA argues that the sums which the Debtor receives under the two programs are proceeds of its pre-petition security interest. The Debtor advances two arguments re-

garding why IPCA does not have a security interest. First, the Debtor argues that the collateral description contained in the IPCA security documents is not sufficiently broad to encompass the payments. Second, the Debtor argues that the Debtor's rights under the programs arose post petition and pursuant to § 552 are not within the scope of IPCA's security interest.

■ The Court finds that IPCA's collateral *does not include the CRP and ACP payments for the following reasons. The Conservation Reserve Program is a set aside program. As I discussed more fully in connection with the diversion program, the Debtor's post petition agreement to set aside acres is a post petition asset which is not proceeds of a pre-petition asset. For that reason, IPCA does not have a security interest in CRP payments. The ACP payments are subject to the same analysis. In addition, IPCA's limited security agreement is not broad enough to cover ACP payments. ACP compensates the farmer for part of the cost of using certain conservation practices. Such practices are not a crop, and are not proceeds of a set aside program.*

**III. Adequate Protection.**

■ In order for the Debtor to use cash collateral he must prove that IPCA is adequately protected. § 363(c) and (e). IPCA has a second mortgage on Debtor's three parcels of real property. The net amount of $208,934 would be available to pay IPCA if the real estate sold as of August 12, 1986, the date the cash collateral hearing was held. This amount was calculated as follows:

| | |
|---|---|
| $934,000 | Value—(The Court made no deduction for sale as a single large parcel because there was no evidence that the parcels could not be sold separately). |
| (93,000) | Deduction for cash sale |
| (56,040) | 6% sales costs—(Mr. Burns, the appraiser, testified that sales costs would be 5–7%. I used the middle figure.) |
| (535,941) | Net amount due Federal Land Bank after deducting value of the B stock |

which it holds as additional collateral.

(39,684) Real property taxes outstanding.

IPCA has the following additional collateral:

| | |
|---|---|
| $ 6,830 | IPCA B Stock |
| 16,000 | Balance of 1985 crop proceeds (Debtor has spent $29,083 of which $4,100 comes from storage and diversion payments in which IPCA does not have an interest.) |
| 12,000 | Deficiency payment. |
| 40,000 | 1986 crop. |
| 25,000 | Portion of ARP and CRP payments on which IPCA has been granted a replacement lien for cash collateral used. |
| $99,830 | TOTAL |

Thus, IPCA has collateral with a gross realizable value of $308,764. If IPCA were to realize on its collateral, it would have to foreclose its mortgages. That would take approximately six months. During that time, approximately $40,500 in interest on the tax, Federal Land Bank and IPCA liens would accrue. Attorney's fees and real property taxes accruing during the foreclosure would add another $15,000. Thus, IPCA would potentially net $253,000 upon foreclosure. Since IPCA is owed approximately $96,000, a substantial equity cushion exists.

The Debtor's budget indicates that he needs a total of $63,806 from September through December. That amount must be reduced by $2,500 for September money already received, $1,500 in reduced rent, and $1,155 in reduced December living expenses pursuant to a prior order of this Court. Thus, the amount of cash which the Debtor needs between now and the end of the year is $58,651. The Debtor should have available $107,700 cash during the same period. That amount consists of the following: $12,000 deficiency payment, $16,000 balance 1985 crop proceeds, $40,000 1986 crop proceeds, $39,700 ARP and ACP payments.

Given the equity cushion which exists, the Debtor has demonstrated that he can provide IPCA adequate protection and he should be permitted to use $58,651 in cash collateral. Expenditures are to be in accordance with the budget the Debtor previously submitted to the Court. IPCA will

be granted a lien on all the Debtor's property, including the crop to be planted, and a 507(b) priority in order to assure adequate protection. The Court does not intend to authorize any further use of cash collateral. The Debtor should be able to propose and confirm his reorganization plan between now and the end of the year.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law, and pursuant to Bankruptcy Rule 7052, they will not be separately stated. Counsel for the Debtor is directed to lodge, serve and prepare an order in accordance with the views expressed herein.