**In the Matter of George Vernon HUNERDOSSE, Audrey E. Hunerdosse, Engaged in Farming, Debtors.**

**Bankruptcy No. 87–1435–C.**

United States Bankruptcy Court, S.D. Iowa.

April 27, 1988.

Anita L. Shodeen, Des Moines, Iowa, Trustee.

Dallas J. Janssen, West Des Moines, Iowa, for debtors.

Kevin R. Query, Asst. U.S. Atty., Des Moines, Iowa, for FmHA.

## ORDER ON OBJECTIONS TO PLAN

LEE M. JACKWIG, Chief Judge.

On December 3, 1987 a preliminary hearing on confirmation of plan was held in Des Moines, Iowa. Among those present at the hearing were Dallas J. Janssen, appearing on behalf of the debtors and Kevin R. Query, Assistant U.S. Attorney, appearing on behalf of the Farmers Home Administration (FmHA). The parties dispute whether the FmHA has an interest in certain crops and government payments that must be reflected in the FmHA's allowed secured claim. They also question whether lien avoidance is available to Chapter 12 debtors. The parties subsequently submitted the matter on briefs and a stipulation of facts.

### FACTUAL BACKGROUND

The parties stipulate to the following facts:

1. On May 28, 1987 the debtors filed a petition for relief under Chapter 12.

2. The FmHA filed a proof of claim on August 5, 1987 showing a claim against the debtors in the amount of $227,760.65 as of July 21, 1987 with daily interest accrual thereafter of $24.3825.

3. Since 1976 the debtors have obtained their operating capital from FmHA. The last advance occurred in approximately March of 1985 to finance the 1985 crop.

4. To secure the operating loans, the debtors granted the FmHA a security interest in certain personal property. The parties executed security agreements first on December 12, 1975 and then on an annual basis until September 25, 1985.

5. The security agreements provide in part:

DEBTOR HEREBY GRANTS to Secured Party [FmHA] a security interest in the following collateral, including the proceeds and products thereof:

*Item 1.* All crops ...

. . . .

*Item 2.* All farm and other equipment

. . .

. . . .

*Item 3.* All livestock ...

. . . .

*Item 4.* All accounts, contract rights and general intangibles, as follows: [nothing listed]

6. A security agreement dated July 10, 1986 states:

DEBTOR HEREBY GRANTS to secured party [FmHA] a security interest in the following collateral, including the proceeds and products thereof:

. . . .

*Item 4.* All accounts, contract rights and general intangibles, as follows:

All government payments.

The debtors did not sign this security agreement.

7. The FmHA properly perfected its security interests by filing a financing statement with the Secretary of the State of Iowa on December 24, 1975. Continuation statements were filed with the Secretary on November 12, 1980 and July 3, 1985.

8. In the spring of 1986, the debtors enrolled and were accepted into the 1986 Feed Grain Program (Program) administered by the Agricultural Stabilization and Conservation Service (ASCS).

9. The debtors received the following 1986 program payments:

| Date | Payment | Amount |
| --- | --- | --- |
| April/May 1986 | Check | $2,486.74 |
| July 22, 1986 | Check | $1,060.50 |
| August 11, 1986 | Certificate | $ 824.83 |
| April 29, 1987 | Check | $ 435.06 |
| April 29, 1987 | Certificate | $ 503.47 |
| October 1987 | Check | $1,913.46 |
| October 1987 | Certificate | $1,999.45 |

All of the funds received from the 1986 Program were deficiency payments as opposed to diversion payments.

10. On February 25, 1987 the debtors applied to participate in the 1987 Feed Grain Program. The ASCS approved the application on April 7, 1987.

11. The debtors received the following 1987 program payments:

| Date | Payment | Amount |
| --- | --- | --- |
| July 1, 1987 | Check | $2,627.46 |
| July 1, 1987 | Certificate | $2,627.44 |
| July 20, 1987 | Certificate | $1,732.69 |

Of the foregoing payments, $866.35 of the July 1, 1987 cash payment constituted a diversion payment and $866.34 of the certificate paid on July 1, 1987 amounted to diversion payments.

12. The debtors anticipate receiving an additional 1987 program payment in 1988 in the amount of $5,283.32.

13. The debtors planted the majority of their 1987 crop after they filed bankruptcy. The only exception was a crop planted on a parcel owned by Ernest Hunerdosse. The debtors farmed that on a 50–50 crop share basis. That parcel contained 19 acres of corn and yielded 95 bushels per acre. Using the $1.78 sealing price for Warren County, the value of the prepetition crop was $1,606.45. The debtors' cost of seed, fertilizer and chemicals in making this crop was $405.00.

14. In January of 1987 FmHA released to the debtors a check in the amount of $1,774.05 which represented proceeds from

the sale of 1985 corn overrun. The proceeds were used to make payment on the following miscellaneous farm and personal expenses:

| Creditor | Date of Statement | Description | Date of Payment | Amount |
|---|---|---|---|---|
| Big Bear | 4–29–87 | Bolt | 4–29–87 | $ 3.98 |
| Warren Cty. Treas. | 12–12–86 | Vehicle license fee | 2–13–87 | 70.00 |
| FS Feeds | 2–23–87 | Pig starter | 2–23–87 | 16.61 |
| Big Bear | 2–16–87 | Heat lamps | 2–16–87 | 16.97 |
| R & R Welding | 2–7–87 | Oxygen | 2–7–87 | 14.28 |
| KL Auto Parts | 4–27–87 | Belt | 4–27–87 | 3.78 |
| Hi–Way Parts | 4–7–87 | Carburetor kit | 4–7–87 | 15.55 |
| Hi–Way Parts | 4–7–87 | Carburetor cleaner | 4–8–87 | 11.71 |
| Standard Bearings | 3–30–87 | Chain feed mill | 3–30–87 | 7.14 |
| R & M Equipment | 3–10–87 | Brake for D–17 tractor | 3–10–87 | 20.12 |
| Iowa Power | 1–12–87 | Power bill, Oct., Nov., Dec. 1986 | 2–3–87 | 803.02 |
| ASCS | 1–16–87 | Measure bins | 1–16–87 | 14.00 |
| Big Bear | 1–24–87 | Salt for cattle | 1–24–87 | 22.87 |
| Wilson & Fowler | 2–16–87 | 1986 tax preparation | 2–16–87 | 55.00 |
| Wilson & Fowler | 4–14–87 | 1986 tax preparation | 4–14–87 | 10.00 |
| | | Misc. living expenses Nov., 86—Jan. 87 | | 689.02 |
| | | | | $1,774.05 |

15. On or about May 15, 1987 the FmHA released checks to the debtors in the amount of $12,719.45 which represented proceeds from the sale of 1986 sealed corn, oats and livestock. The expenses paid with the released funds are as follows:

| Creditor | Date of Statement | Description | Date of Payment | Amount |
|---|---|---|---|---|
| Sams Oil Co. | 10–17–87 | Diesel fuel | 4–15–87 | $ 239.58 |
| | 10–17–87 | Regular gas | 4–15–87 | 461.16 |
| | 12–1–86 | Service charge | 4–15–87 | 10.51 |
| | 1–1–87 | Service charge | 4–15–87 | 10.67 |
| | 2–1–87 | Service charge | 4–15–87 | 10.83 |
| | 3–1–87 | Service charge | 4–15–87 | 10.99 |
| | 4–1–87 | Service charge | 4–15–87 | 11.16 |
| Iowa Power | 4–8–87 | Jan., Feb., March 1987 | 4–15–87 | 592.80 |
| Daryl Campbell | 3–9–87 | Cleaning 904 bu. of oats | 4–15–87 | 354.38 |
| Indianola Vet | 4–15–87 | Pulling calf | 4–15–87 | 35.00 |
| Pemble & Son | 12–1–86 | 400 lb. gas and tax | 4–15–87 | 97.76 |
| FS Feeds | 12–16–86 | LP Gas—Crop drying | 4–15–87 | 337.50 |
| | 1–12–87 | Finance charge | 4–15–87 | 5.57 |
| IRS | 1986 | Social Sec. Tax–86 | 4–15–87 | 870.00 |
| Warren Cty. Treas. | 1986 | Real estate taxes | 4–15–87 | 3,960.00 |
| Dallas Janssen | | Legal fees | 4–15–87 | 1,200.00 |
| | | Purchased used car | 5–19–87 | 2,360.00 |
| | | Car insurance | 5–19–87 | 57.00 |
| Treasurer | | Tax and license for car | 5–19–87 | 91.40 |
| | | Farm liability ins. | 5–19–87 | 299.97 |
| | | R.E. appraisal | 5–5–87 | 700.00 |
| | | Misc. living expenses Nov. 86—May 87 | | 1,003.17 |
| | | | | $12,719.45 |

16. The debtors propose to fix the FmHA's allowed secured claim at $25,-618.99 which reflects the value of the debtors' machinery less exemptions.

17. The debtors seek to avoid the FmHA's lien on machinery valued at $16,-930.00.

## DISCUSSION

The FmHA advances a number of arguments in support of its position that it possesses on interest in certain crops and government payments. Before addressing these issues it is important to examine the nature of the government programs involved in this case.

The Feed Grain Program is a product of the Food Security Act of 1985. Food Security Act of 1985, Pub.L. No. 99–198, sections 401–403, 99 Stat. 1354, 1395–1406 (1985) (now codified at 7 U.S.C. sections 1421, 1444b, 1444e, 1444e–1 and 1461). A component of the Feed Grain Program is the deficiency program. One court described its workings as follows:

> The deficiency payment is designed to provide an income supplement to the farmer by insuring an adequate price for his crop. In this program, the farmer must plant a crop. The deficiency payment is determined by multiplying the number of acres planted (not harvested) by the farmer times the established historical yield (not actual yield) for that farm land times the difference between the national average market price for the crop and a "target price" for that same crop. If the price of the crop doesn't reach the target price, the farmer then gets the deficiency payment up to a maximum amount as set by the program. The deficiency payment is not tied to the farmer's actual yield. The deficiency payment will not be changed if a particular farmer's yield is larger or smaller than the government's established historical yield.

*In re Kruger*, 78 B.R. 538, 540 (Bankr.C.D. Ill.1987).

Another element of the Program is the diversion program. Participation in the diversion program requires producers to divert crop acres to a conservation use. In return for government payments, producers are obligated to plant cover crops on the diverted acres and control erosion, insects, weeds and rodents. *See generally*, 7 C.F.R. sections 713.53, 713.60–.74.

### I.

The FmHA first claims an interest in Program benefits under the offset provisions found at 7 C.F.R. Part 13. This court examined and rejected the identical argument made by the FmHA in *Matter of Butz*, —— B.R. —— (Bankr.S.D.Iowa 1988). The *Butz* analysis and conclusion of law pertaining to the administrative setoff issue are dispositive of the FmHA's setoff argument in this case.

### II.

The FmHA next argues that Program payments are not part of the bankruptcy estate and therefore are not protected by the automatic stay. The commencement of a bankruptcy case creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. section 541(a)(1). It is clear Congress considered this provision to include all kinds of property. *See* S.Rep. No. 989, 95th Cong., 2d Sess., 82 (1978), *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 5787, 5868; H.R.Rep. No. 595, 95th Cong., 1st Sess, 367–68 (1977), *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 6322–24. Under section 541(a)(6), "[p]roceeds, product, offspring, rents, or profits of or from property of the estate" are included in the estate with the exception of "earnings from services performed by an individual debtor." The FmHA views the Program payments as falling within the earnings excep-

tion of section 541(a)(6). That view is at odds with the operation of the Program.

■ Participation in the Program does not require a producer to render personal services. On the contrary, regulations governing the Program clearly contemplate Program eligibility for those not rendering services to make a crop. For example, 7 C.F.R. section 713.50 which governs contracting procedures speaks of "producer eligibility." "Producer" is defined in part as a "person who as ... landlord ... shares in the risk of producing the crop, or would have shared had the crops been produced." 7 C.F.R. section 713.3(u). Typically landlords perform few, if any, personal services in producing a crop. The earnings exception only applies to services performed *personally* by an individual debtor. *In re Fitzsimmons,* 725 F.2d 1208, 1211 (9th Cir.1984). *See also In re Bowling,* 64 B.R. 710 (Bankr.W.D.Mo.1986) (payments made under the Dairy Termination Program not earnings from services performed); *In re Weyland,* 63 B.R. 854 (Bankr.E.D.Wis.1986) (payments made under the Dairy Termination Program not earnings from services performed).

### III.

A. *Deficiency Payments*

■ The FmHA maintains it has a secured interest in deficiency payments because the payments are proceeds of crops that would have been earned had it not been for the Program. Were the court to accept the FmHA's position, it is clear the FmHA's security interest would extend to the payments under the Iowa Uniform Commercial Code. *See* Iowa Code section 554.9306 (security interest continues in identifiable proceeds).

For its argument, the FmHA primarily replies on *In re Sumner,* 69 B.R. 758 (Bankr.D.Or.1986). There the court found that deficiency payments are proceeds of a planted crop under the Uniform Commercial Code (UCC). This court, however, is persuaded by the reasoning set forth in *In re Kruger,* 78 B.R. 538 (Bankr.C.D.Ill. 1987). There the court ruled that deficien-

cy payments made under the 1985 Program were not proceeds. The court first noted that 9–306 of the UCC required a sale, exchange, collection or other disposition of the collateral for them to be "proceeds." *Id.* at 541. From the section 9–306 definition of proceeds and the Seventh Circuit's ruling in *In re Schmaling,* 783 F.2d 680 (7th Cir.1986) (payment made under 1983 PIK program not "proceeds"), the court set out three conditions that must be present before benefits paid under a particular farm program will be deemed "proceeds":

1) a crop must be planted;

2) there must be a disposition of the crop; and

3) the entitlement which the secured creditor is claiming must have been received in connection with that disposition.

The court applied this test to the 1985 deficiency payments and found the first condition was met but not the second and third conditions. The court explained:

The payment is in no way dependent upon a sale exchange or other disposition, nor does it flow from a sale, exchange or other disposition. The payment is the result of a contract with the federal government to provide an income supplement to the farmer. The payment will be made regardless of whether the crop is the object of a 'sale, exchange, collection, or other disposition.' It will be made even if the crop is never harvested, or if harvested, if the farmer keeps and uses the crop. Furthermore, the payment is calculated on an estimated, not an actual yield.

*Kruger,* 78 B.R. at 541.

The court went on to criticize cases such as *In re Nivens,* 22 B.R. 287 (Bankr.N.D. Texas 1982) in which deficiency payments were deemed "proceeds". The *Kruger* court found such cases conceptually flawed for failing to consider that deficiency payments are paid regardless of a disposition of a crop. Additionally, the *Kruger* decision points out that the court in *In re Sumner* failed to discuss section 9–306 of the UCC.

Applying the rationale set out in *Kruger*, this court finds that the deficiency payments made to the debtors are not "proceeds" for purposes of the UCC.

B. *Diversion Payments*

■ Application of the *Kruger* test to the payments made under the diversion program leads the court to conclude diversion payments are not "proceeds." First, no crop must be planted. Although a producer is required to plant a cover crop such as perennial grass or small grains such as barley and oats for conservation purposes, the producer is prohibited from growing corn and soybeans and use of the diverted acres is severely restricted. *See,* 7 C.F.R. sections 713.62 and 713.63. In essence, the producer is paid for *not* growing feed grains. Furthermore, diversion payments are not based upon disposition of a crop. Other courts addressing whether diversion entitlements are "proceeds" have ruled they are not. *See In re Sumner, supra* at 763–764; *In re Lion Farms, Inc.,* 54 B.R. 241, 244 (Bankr.D.Kan.1985); and *In re Kruse,* 35 B.R. 958, 966 (Bankr.D.Kan. 1983).

IV.

The debtors maintain that the security agreements do not cover government payments. They point to the FmHA's failure to list government payments after the phrase contained in the security agreements that provides that the debtors grant to FmHA a security interest in "[a]ll accounts, contract rights and general intangibles, as follows: [nothing listed]".

■ In the context of the UCC, contractual rights to farm program benefits are "general intangibles." *See Matter of Sunberg,* 35 B.R. 777 (Bankr.S.D.Iowa 1983) (payments made under 1983 PIK program are "general intangibles" under Iowa Code section 554.9106) *aff'd* 729 F.2d 561 (8th Cir.1984). *Accord, In re Liebe,* 41 B.R. 965 (Bankr.N.D. Iowa 1984); *In re Schmidt,* 38 B.R. 380 (Bankr.D.N.D.1984).

■ Iowa Code section 555.9203(1)(a) states in part that a security interest is not enforceable against a debtor unless "the debtor has signed a security agreement which contains a description of the collateral." The official comments to this provision reveal that its purpose is evidentiary; that a written record minimizes disputes as to what property serves as collateral for an obligation. Comments to Official Text, Iowa Code Ann. section 554.9203. A security interest does not attach to property that is not described in a security agreement. *Matter of Rogers,* 6 B.R. 472, 475 (Bankr.S. D. Iowa 1980). The test for determining whether a description of collateral is sufficient is whether it reasonably identifies what is described. Iowa Code section 554.-9110. Vague or imprecise terms are strictly construed against the drafter of the security agreement. *In re Wolsky,* 68 B.R. 526, 528 (Bankr.D.N.D.1986).

■ The security agreements in question are insufficient to give the FmHA a security interest in "general intangibles". The security agreements speak of the debtors granting the FmHA a security interest in "all ... general intangibles *as follows:*". The clear meaning of the language used with respect to "general intangibles" is that a security interest would attach to only those "general intangibles" specifically listed. By using the words "as follows", the FmHA chose to limit the reach of the security agreements. The FmHA's failure to specifically list any "general intangibles" means that no security interest attaches thereto. Apparently the FmHA realized its mistake and drafted a security agreement dated July 10, 1986 which listed "all government payments" after the "as follows" language. The debtors however did not sign that security agreement.

V.

■ Even if the court were to find that the FmHA possessed a security interest in "general intangibles", the government's interest would be curtailed by operation of federal statutes and regulations.

In *Matter of Halls,* 79 B.R. 417 (Bankr.S. D. Iowa 1987) this court examined statutory and regulatory provisions governing payments under the Program. The court

found that those provisions mandated that program payments made in cash and related to crops that the creditor had no part in making could not be subjected to a creditor's security interest. The evidence indicates that the FmHA did not assist the debtors in making the 1986 or 1987 crop. Therefore, the 1986 and 1987 Program payments made in cash are not subject to the FmHA's security agreement.

This court in *Halls* also found that federal regulations prohibited creditors from encumbering certificates. 7 C.F.R. section 770.4(b) provides:

(b) Liens, encumbrances, and State law.
(1) The provisions of this section or the commodity certificates shall take precedence over any state statutory or regulatory provisions which are inconsistent with the provisions of this section or with the provisions of the commodity certificates.
(2) Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest, except that of an agency of the United States Government arising specifically under Federal statute.

Under subsection (2), an exception to the encumbrance prohibition exists for a United States agency whose lien arises specifically under federal statute. The FmHA, a United States agency, maintains that this exception applies to it because of the operation of 7 U.S.C. section 1989. This provision states:

The Secretary is authorized to make rules and regulations, prescribe the terms and conditions for making or insuring loans, security instruments and agreements, except as otherwise specified herein, and make such delegations of authority as he deems necessary to carry out this title.

*Id.* The FmHA also cites 7 C.F.R. section 1941.19(e), a regulation promulgated under 7 U.S.C. section 1989. The regulation provides:

(e) Income from products and program payments. Assignments and consents relating to income from products and program payments will be used when

necessary to protect FmHA's interest as follows:

(1) Form FmHA 441-8, "Assignment of Proceeds from the Sale of Agricultural Products," for products or income in which FmHA does not have a security interest under UCC. Other forms approved by OGC may be used when this form is not adequate.

(2) Form FmHA 441-18, "Consent to Payment of Proceeds from Sale of Farm Products," for products or income, except dairy products, in which FmHA has a security interest under UCC.

(3) Form FmHA 441-25, "Assignment of Proceeds from the Sale of Dairy Products and Release of Security Interest," for dairy products in which FmHA has a security interest under UCC.

(4) Forms provided by ASCS will be used for assignment of incentive and other agricultural program payments.

7 C.F.R. section 1941.19(e). The provisions relied upon by the FmHA are not the equivalent of the types of statutes contemplated by section 770.4(b)(2). That exception only concerns liens, encumbrances, security interests or other claims arising *specifically* under federal statute. The authorities cited by the FmHA do not create interests in property. They simply allow the FmHA to prescribe the terms for making security agreements and set forth the forms to be used in taking assignments. *Cf. In re Sunberg,* 729 F.2d 561 (8th Cir.1984) (regulations did not affect security interest but rather prevented the government from being entangled in third party disputes). Statutes that create liens generally use precise language. For example, the statute concerning estate tax liens states that "the estate tax imposed ... shall be a lien upon the gross estate...." 26 U.S.C. section 6324. No such language is found in 7 U.S.C. section 1989 or 7 C.F.R. section 1941.19(e). The FmHA has not satisfied the exception to section 770.4(b). Accordingly it is without authority to encumber the certificates.

## VI.

The FmHA claims an interest in 1987 crops. This claim implicates 11 U.S.C. section 552 which reads as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

This statutory scheme in essence means that a bankruptcy filing severs prepetition security interests with one important exception—security interests in property acquired prior to filing extend to proceeds of such property acquired by the estate after filing.

First, it is clear that with respect to the 1987 crops planted prepetition, the FmHA's security interest in those crops survived the operation of section 552(b). The parties value the crop planted prepetition at $1,606.45. The debtors acknowledge the FmHA's interest in these crops but maintain the FmHA's interest must be reduced by the $405.00 the debtors expended for seed, fertilizer and chemicals.

 Whether the debtors can credit these planting expenses against the FmHA's allowed secured claim requires consideration of 11 U.S.C. section 506(c) which provides:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

The debtor in possession exercises the rights of a trustee by virtue of 11 U.S.C. section 1203. Thus, the reference in section 506(c) to trustee includes the debtors.

 A creditor will be charged with costs and expenses under section 506(c), if debtors show that the costs and expenses are: (1) necessary, (2) benefitted the creditor and (3) were reasonable. *Matter of Trim–X, Inc.,* 695 F.2d 296, 299 (7th Cir. 1982). The debtors carry the burden of making that showing. *Brookfield Production Credit Ass'n v. Borron,* 738 F.2d 951, 952 (8th Cir.1984); *In re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598, 602 (Bankr.E.D. Va.1985); *In re Hardy,* 39 B.R. 804, 807 (Bankr.N.D.Okla.1984).

 In determining whether expenses are necessary, courts discern whether debtors could have abandoned the property and, if so, allow the debtors to recover from the date of filing the proceedings to the time the property could have been abandoned. *In re Kotter,* 59 B.R. 266, 270 (Bankr.C.D. Ill.1986). Since the expenses claimed by these debtors all relate to planting, the court must assume such expenses were incurred prepetition. As such they cannot be deemed necessary. Accordingly, the debtors cannot deduct the expenses from the value of the prepetition crop.

 The FmHA bases its claim to crops planted postpetition on the theory that the 1987 crops are proceeds of the 1986 crop. The FmHA argues that its release of 1986 crop and livestock proceeds for payment of living expenses and local obligations permitted the debtor to arrange credit for making the 1987 crop. The FmHA contends that it therefore follows that the 1987 crop should be considered proceeds.

"Proceeds" is defined at Iowa Code section 554.9306(1) as "whatever is received

upon the sale, exchange, collection or other disposition of collateral or proceeds." Section 554.9306(1) contemplates a direct relationship between what is received and disposition. The FmHA's expansive interpretation of proceeds in effect ignores the language of this provision. To be considered proceeds, the 1987 crop should have been received upon the sale, exchange, collection or other disposition of the proceeds of the 1986 crops and livestock. That did not happen.

### VII.

 The FmHA contends that lien avoidance under 11 U.S.C. section 522(f) is not available to Chapter 12 debtors. In support of its position, the FmHA points to 11 U.S.C. section 1225(a)(5) which provides that where the holder of an allowed secured claim objects to confirmation of a Chapter 12 plan, the debtor must, among other things, "provide that the holder of such claim retain the lien".

In response, the debtors cite *In re Dykstra,* 80 B.R. 128 (Bankr.N.D.Iowa 1987) and *In re Ptacek,* 78 B.R. 986 (Bankr.D.N. D.1987) wherein the respective courts concluded that lien avoidance was applicable in Chapter 12 cases.

This court recently addressed the lien avoidance issue in *Matter of Simmons,* 86 B.R. 160 (Bankr.S.D.Iowa 1988). That decision holds that lien avoidance is available in a Chapter 12 case but the actual avoidance of the lien may not occur until the discharge becomes effective pursuant to 11 U.S.C. section 1228. However, the value of any exempt property subject to a lien is subtracted in calculating the creditor's allowed secured claim.

### CONCLUSION AND ORDER

WHEREFORE, for the reasons expressed above, the court finds that the FmHA does not have a security interest in 1986 and 1987 government farm payments and in the 1987 crops planted postpetition. The FmHA does however have a security interest in 1987 crops planted prepetition. The court further finds that lien avoidance

is available to the debtors but only upon discharge.

THEREFORE, the FmHA's objections to the plan are sustained insofar as the plan does not reflect the FmHA's interest in the 1987 crops planted prepetition and insofar as the plan contemplates lien avoidance other than upon discharge. The FmHA's other objections to the plan are overruled.