In the Matter of Paul M. HOLLIN-RAKE, Patricia L. Hollinrake, Debtors.

Paul M. HOLLINRAKE, Patricia L. Hollinrake, Plaintiffs,

v.

FEDERAL LAND BANK OF OMAHA, United States of America, Federal Deposit Insurance Corporation (Receiver of the Peoples National Bank and Trust Company, Albia, Iowa), James E. Huyser, Iowa Coal Mining Company, Superior Coal Company, Star Coal Company, and Hertz Farm Management, Inc., Defendants,

and

First National Bank of Kirksville, Kirksville, Missouri, Intervenor.

Bankruptcy No. 86-3294-C J.
Adv. No. 87-0008.

United States Bankruptcy Court, S.D. Iowa.

Oct. 31, 1988.

Michael P. Mallaney, Des Moines, Iowa, for debtors.

Thomas H. Burke, Des Moines, Iowa, for FLB.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for U.S.

Barbara G. Barrett and Ronald L. Anderson, Des Moines, Iowa, for 1st Nat. Bank.

Anita L. Shodeen, Des Moines, Iowa, Chapter 12 Trustee.

Donald W. Allen, W. Des Moines, Iowa for FDIC.

Philip Ostein, Des Moines, Iowa for J. Huyser–Iowa Coal.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT, MOTION FOR SUMMARY JUDGMENT, CROSS MOTION FOR SUMMARY JUDGMENT

LEE M. JACKWIG, Chief Judge.

On January 14, 1987 Paul and Patricia Hollinrake filed an adversary complaint for turnover of property, to determine validity of liens, to determine allowed claims and to void liens. The Hollinrakes invoke 11 U.S.C. sections 506, 543, 544, 551 and 552. The Federal Deposit Insurance Corporation (FDIC), Federal Land Bank (FLB) and Farmers Home Administration (FmHA) filed answers on January 26, 1987, February 12, 1987 and February 19, 1987 respectively. James Huyser, Iowa Coal Mining Company, Superior Coal Company and Starr Coal Company filed an answer on February 17, 1987. On February 25, 1987 First National Bank of Kirksville, Missouri (First National) moved to intervene based upon its purchase of certain assets from the FDIC. The court granted First National's motion on February 27, 1987. First National answered on March 4, 1987. On April 6, 1988 the court permitted the FDIC to withdraw from the case since it had assigned its interest in the matter to First National. The court also permitted James Huyser and the coal companies to withdraw as disinterested stakeholders.

In their motion for partial summary judgment, the Hollinrakes argue that their status as a hypothetical lien creditor under 11 U.S.C. section 544 gives them a superior claim to coal royalty payments ahead of the FmHA. The Hollinrakes further assert

that the avoided lien of the FmHA is automatically preserved for the benefit of the estate ahead of First National's lien pursuant to 11 U.S.C. section 551.

First National resisted the Hollinrakes' motion. It also filed a motion for summary judgment arguing that an assignment of royalties executed by the Hollinrakes to First National's predecessor in interest and filed with the Iowa Secretary of State gives First National a superior interest in the royalties.

The FLB also moved for summary judgment. It maintains that its interest in the royalties is superior by virtue of certain assignment language contained in a mortgage executed by the Hollinrakes to the FLB on December 31, 1974.

The FmHA did not file a dispositive motion nor did it resist the other parties' motions.

The parties have submitted these matters on affidavits, statements of undisputed facts and briefs. The Hollinrakes and the FLB have submitted their value dispute on appraisals.

### Factual Background

The debtors filed a petition for relief under Chapter 12 on December 15, 1986. The Hollinrake farm consists of 1999 acres located in Monroe County, Iowa. Portions of the land are suitable for row cropping and livestock grazing. The land contains coal deposits which were mined at one time.

On December 31, 1974 the Hollinrakes executed and delivered a note to the FLB in the amount of $300,000.00. As of December 15, 1986 the Hollinrakes owed the FLB $245,129.31. The note is secured by a first mortgage on 1339 acres. "Rents" are included in the granting clause of the mortgage. Paragraph 12 of the mortgage provides in relevant part as follows:

(12) Assignment of Proceeds of Mineral Lease.

Mortgagors hereby transfer, set over, and convey to Mortgagee all rents, royalties, bonuses, and delay moneys that may from time to time become due and payable under any oil, gas, or other mineral lease of any kind now existing or that may hereafter come into existence, covering the above land or any part thereof.

The Hollinrakes and the FLB executed the mortgage on December 31, 1974. The FLB filed the mortgage with the Monroe County Recorder on January 17, 1975. The FLB did not file a financing statement with the Iowa Secretary of State.

The Hollinrakes and Starr Coal Company executed a mining lease on June 6, 1980. The lease provided that in exchange for the right to mine coal and other minerals on the Hollinrake farm, the coal company would pay the Hollinrakes certain royalties.

Between December 15, 1977 and May 10, 1985 the Hollinrakes executed and delivered a number of notes to the FmHA. The notes are secured by a number of mortgages subject to the FLB's mortgage interest. According to the FmHA's proof of claim filed February 19, 1987, the indebtedness is $394,561.71. On April 3, 1985 the Hollinrakes executed an assignment of income from real estate security in favor of the FmHA. The assignment concerns royalty payments made under the mineral lease. The FmHA did not record the assignment with the Monroe County Recorder nor did it file a financing statement with the Iowa Secretary of State.

First National has mortgage interests in the Hollinrake farm. The mortgages secure a number of notes executed by the Hollinrakes in favor of the Peoples National Bank and Trust of Albia (Peoples). The debtors also granted Peoples a blanket security interest. The security agreements cover, among other things, accounts, documents and contract rights. Peoples properly perfected the agreements with the Secretary of State. On August 20, 1985 the Hollinrakes assigned to Peoples all proceeds, rents and royalties due under the mineral lease. Peoples recorded the assignment with the Monroe County Recorder on that same date. The FDIC acquired the notes, mortgages and assignment after Peoples failed. Later the FDIC transferred these assets to Community Investment Consultants, Inc. (CICI). Sometime there-

after CICI transferred the assets to First National. The proof of claim filed by First National on March 6, 1987 evidences an indebtedness in the amount of $458,771.85.

On November 17, 1986 the FLB filed a foreclosure action against the Hollinrakes in the Iowa District Court for Monroe County. On December 12, 1986 the Iowa District Court for Monroe County appointed Hertz Farm Management, Inc. (Hertz) as receiver. On December 18, 1986 the same court ordered that the October 1986 royalties in the amount of $15,251.82 and the December 1986 payment in the amount of $2,100.00 be paid to Hertz. The court also ordered that all future payments be made to Hertz. The coal company paid Hertz the November 1986 royalty payment in the sum of $10,671.44. After the debtors filed bankruptcy the coal company placed approximately $60,000.00 in royalty payments in an escrow account.

The Hollinrakes assert the value of the 1339 acres is $133,900.00 and the value of the 660 acres is $49,500.00. The FLB maintains the value of the 1339 acres is $267,-800.00. Both parties rely on appraisals in support of their contentions.

### DISCUSSION

### I.

*Section 506 Lien Avoidance*

11 U.S.C. section 506(a) provides that an allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of the creditor's interest in the estate's interest in the property. Thus an undersecured creditor's claim consists of an allowed secured claim to the extent of the value of the security and an unsecured claim as to the balance. *In re Hall,* 752 F.2d 582, 589 (11th Cir.1985). With certain exceptions, 11 U.S.C. section 506(d) provides that "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void".

A section 506 valuation determination can profoundly affect a Chapter 12 reorganization because 11 U.S.C. section 1225(a)(5)(B)(ii) requires that, as of the effective date of the plan, the property distributed under the plan must not be less than the amount of a creditor's allowed secured claim. Section 506(a) states that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." The Code's elastic approach to value determinations requires that a court take into account the interest being protected and the context in which a value determination is being made. 3 *Collier on Bankruptcy,* ¶ 506.04 (15 ed. 1986). In a Chapter 12 reorganization, the interest to be protected is often the right of a secured creditor to realize the value of the collateral in which it has a security interest and which the reorganized debtor will continue to use. *In re Beyer,* 72 B.R. 525, 527 (Bankr.D.Colo.1987).

Howard J. Aleff of Knoxville, Iowa conducted the appraisal for the Hollinrakes. He concluded that the 1339 acres had a value of $100.00 per acre or a total value of $133,900.00. Aleff relied solely upon the market approach in reaching his conclusion. He examined three comparable sales, of which all were conducted prior to 1987. Cash prices for the sales were $75.00 per acre, $40.00 per acre and $68.00 per acre respectively. Aleff adjusted the prices of the comparables upward. He assigned no value to the coal lease because of the coal company's plans to cease operations on the Hollinrakes' farm. Aleff valued the 660 acres at $75.00 per acre for a total value of $49,500.00. He based his conclusion on the three comparable sales he used in evaluating the 1339 acres.

Neill S. Thompson conducted an appraisal of the 1339 acres for the FLB. He valued the land at $200.00 per acre for a total of $267,800.00. He utilized the income and market approaches to reach his conclusion. Thompson examined six comparable sales, of which the latest occurred on December 30, 1986. For each comparable, Thompson assigned a value to a particular type of land. For example, he found that the best cropland in comparable # 3 is

worth $400.00 per acre and that the pastureland is worth $45.00 per acre. From these values he derived values for the different types of land found on the Hollinrake farm. Thompson also explained what significance each comparable sale had on his determination. Furthermore, Thompson derived a 12.7% capitalization rate from one of the comparables and applied it to income and expense figures from croplands on the Hollinrake farm to yield a value of $451.73 per acre. Thompson found that the coal lease did not add to the value of the farm. Thompson's conclusions are summarized as follows:

| Type of Land | No. of Acres | Price per Acre | |
|---|---|---|---|
| Cropland | | | |
| Row Crop | 314.4 | $400.00 | $125,760.00 |
| Tillable | 473.7 | 200.00 | 94,740.00 |
| Excavation | 250 | 65.00 | 16,250.00 |
| Pasture & Woodland | 273.7 | 50.00 | 13,685.00 |
| Farmstead | 1.0 | | 3,975.00 |
| Improvements | | | 13,390.00 |
| | | Total | $267,800.00 |

The court finds that the Aleff appraisal lacks any meaningful analysis. In essence, that appraiser simply compiled information and stated a conclusion. He made no effort to explain how or what aspect of that information led to his conclusion. As a result, the court gives little weight to Aleff's appraisal.

In contrast, the Thompson appraisal provided an analysis of the information compiled. Consequently the court can ascertain whether the conclusion drawn from the information is reasonable. The court finds that Thompson's conclusion is reasonable in light of the analysis he employed and the information he gathered. This is not to say that his appraisal is without fault. Ideally an appraiser will utilize all three of the widely recognized approaches to valuation—cost, income and market. Thompson failed to use a cost approach. Although the court places emphasis on a market analysis, cost and income approaches provide useful checks on market conclusions.

Based upon the Thompson appraisal, the court finds that the value of the 1339 acres is $267,800.00. With respect to the 660 acres, only the Hollinrakes submitted an appraisal. Despite the deficiencies of the appraisal, the court adopts Aleff's conclusion that the 660 acres is worth $49,500.00. To the extent that any liens exceed these values, they shall be void upon discharge under 11 U.S.C. section 1228. *Cf. Matter of Simmons*, 86 B.R. 160 (Bankr.S.D. Iowa 1988) (lien avoidance pursuant to 11 U.S.C. § 522 appropriate in Chapter 12 but actual avoidance conditioned upon entry of discharge); *Matter of Hunerdosse*, 85 B.R. 999 (Bankr.S.D. Iowa 1988) (despite delay of actual lien avoidance until discharge, value of exempt property would be deducted from allowed secured claim).[1]

## II.

### Motions for Summary Judgment

The next issue is who has the superior interest in the coal royalties. The parties raise a host of subissues in advancing their respective positions. Before turning to those questions, it is important to set out the standard the court must utilize.

Bankruptcy Rule 7056 provides that Federal Rule of Civil Procedure 56 which governs summary judgments applies in bankruptcy adversary proceedings. The Eighth Circuit Court of Appeals has set forth the following guidelines:

> Summary judgment is appropriate only when the moving party satisfies its burden of showing the absence of a genuine issue as to any material fact and that it is entitled to judgment as a matter of law. In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the opposing party and must give that party the benefit of all reasonable inferences to be

---

1. Given the ultimate and combined effect of 11 U.S.C. sections 1225, 1226 and 1228, it is doubtful that a section 506(d) action pursuant to Bankruptcy Rule 7001(2) is necessary. Rather, a motion to determine secured value under section 506(a) and in accordance with Bankruptcy Rules 3012 and 9014 or simply the plan term setting the value of the secured claim and subject to objection by the creditor at confirmation would appear to accomplish the same end in the context of a Chapter 12 case.

drawn from the facts. This Court often has noted that summary judgment is "an extreme and treacherous remedy," and should not be entered "unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and unless the other party is not entitled to recover under any discernible circumstances."

*Foster v. Johns–Manville Sales Corp.,* 787 F.2d 390, 391–92 (8th Cir.1986) (citations omitted).

### A. When did the FLB's interest in royalties attach?

■ In the absence of any conflict between state law and bankruptcy law, the law of the state in which the property is situated governs questions of property rights. *Johnson v. First National bank of Montevideo, Minn.,* 719 F.2d 270, 273 (8th Cir.1983). The Iowa Supreme Court has declared that royalties payable upon mining coal are in the nature of rent. *Kissick v. Bolton,* 134 Iowa 650, 112 N.W. 95, 96 (1907); *Lacey et al. v. Newcomb,* 95 Iowa 287, 63 N.W. 704 (1895).

First National argues that the FLB's lien on the royalties did not attach until the FLB brought a foreclosure action and requested the appointment of a receiver. First National concludes that because the FLB's foreclosure and request for a receiver occurred after the Hollinrakes assigned the royalties to Peoples, it has priority over the FLB.

In support of its argument First National cites *Hakes v. North,* 199 Iowa 995, 203 N.W. 238 (1925). In that case, a mortgagor rented mortgaged farmland to a third party and then pledged the rents as collateral for a loan. The mortgagee foreclosed in November of 1923, obtained a receiver and claimed the rents for 1923 under a provision in the mortgage that provided, in relevant part, that "upon commencement of any suit to foreclose this mortgage ... any court ... may appoint a receiver ... to collect the rents, issues, income, and profits of [the] premises". *Id.* 203 N.W. at 238–9. The state supreme court held that such a provision did not operate as a present lien

upon rents but instead operated only upon the commencement of the foreclosure.

Recently, the Iowa Supreme Court in *Federal Land Bank of Omaha v. Lower,* 421 N.W.2d 126 (Iowa 1988) found that a conveyance of rents along with land in the granting clause created a lien on rents upon execution of the mortgage. The court explained that rents pledged in a granting clause constituted the primary security for the indebtedness. In contrast, the court pointed out that a mere pledge of rents does not create a lien on the rents upon execution of the mortgage. Pledged rents serve only as secondary security for indebtedness until a foreclosure is commenced and a receiver is requested.

In this case, a conveyance of rents is contained in the granting clause of the FLB's mortgage. Accordingly, the court finds that the FLB's lien on the royalties attached upon execution of the mortgage on December 31, 1974.

### B. What rules govern the priority dispute?

■ First National next maintains that a security interest in rents must be perfected in accordance with the Uniform Commercial Code (UCC). First National bases its argument on Iowa Code section 554.9102(2) which states in part that "[t]his Article applies to security interests created by contract including pledge, assignment, chattel mortgage...." The FLB contends that the UCC does not apply by operation of Iowa Code section 554.9104(j) which reads "[t]his Article does not apply ... to the creation or transfer of an interest in or lien on real estate, including a lease for rents thereunder ...". If the UCC did apply, First National's lien would be superior since Peoples filed a financing statement and the FLB did not.

The Iowa Supreme Court cited section 554.9104(j) in finding that the Iowa UCC lien perfection procedure is not applicable to the creation of a lien on real estate rents. *Lower,* 421 N.W.2d at 129. *See also In re Standard Conveyor Co.,* 773 F.2d 198, 204 (8th Cir.1985) (UCC 9–104(j) expressly precludes security interest in the

underlying proceeds of a real estate lease). The *Lower* court went on to observe that the UCC lien perfection procedure found at section 554.9401(1)(c) was inapplicable under the circumstances because the court was determining the validity of an instrument as between the parties to it, not as to any third party. *Lower*, 421 N.W.2d at 129. The Court declined to rule on how a lien on real estate rents should be perfected. *Id.* at 129.

In *Federal Land Bank v. Terpstra*, 90 B.R. 399 (N.D. Iowa 1988), the U.S. District Court for the Northern District of Iowa held that perfection of liens on rents is governed by Iowa Code section 558.41 which states:

> No instrument affecting real estate is of any validity against subsequent purchasers for a valuable consideration, without notice, unless filed in the office of the recorder of the county in which the same lies, as hereinafter provided.

The court discussed the void created by the repeal of the statute that established a recording system for chattel mortgages and the passage of the UCC which by its own terms does not apply to the perfection of a lien on rents. *See* 1965 Iowa Acts, ch. 413 section 10102 (repealed Iowa Code Chapter 556 which governed chattel mortgages). In resorting to section 558.1, the court reasoned:

> Notice is the essence of perfection. Here, where the security interest in rents

was not entitled to be filed and perfected as a UCC interest in personal property (because it was for UCC purposes a lien on or interest in real estate), but was entitled to filing in the county recorder's office as an instrument "relating to real estate," such filing in the real estate records results in the same type of notice that perfection under the UCC gives to personal property security interests— that is notice to the world of the existence of the lien.

It follows therefore that when the Land Bank recorded its mortgage, which conveyed the rents as primary security for the debt, it perfected its lien on those cash rents involved in this case, and the debtor (and the Trustee thereafter) held those cash rent receipts subject to the Land Bank's preexisting lien.

*Terpstra*, at 404. First National makes no claim that either People's or it was without notice of the FLB lien via the mortgage that had been filed with the Monroe County Recorder on January 17, 1975. Thus, under a *Terpstra* common sense approach, the FLB's interest in rents should take priority over that of First National. To this court's knowledge, the U.S. District Court for the Southern District of Iowa has not ruled on this issue. Accordingly, this court will follow the *Terpstra* analysis under the facts of this case.[2]

 First National additionally argues that the rule articulated in *First Trust*

---

**2.** Two weeks before the Iowa Supreme court filed its *Lower* opinion, this court rendered its decision in *Matter of Rief*, 83 B.R. 626 (Bankr.S.D. Iowa 1988). In that case, this court construed an application to sequester rents and profits as a motion for relief from stay to complete perfection. The application was granted because the creditor held a mortgage that contained a granting clause regarding rents and profits and had commenced a foreclosure action and had requested the appointment of a receiver prior to the filing of the bankruptcy petition. The *Rief* decision pointed out the difference between a pledge of rents and profits and a granting clause in a mortgage with respect to attachment. It distinguished *Matter of Spears*, 83 B.R. 621 (Bankr.S.D. Iowa 1987), *aff'd Farm Credit System Capital Corp. v. Spears*, No. 87–569–A, slip. op. (S.D. Iowa Nov. 4, 1987), wherein this court denied a creditor's motion to prohibit the use of cash collateral consisting of

rents and profits because the creditor did not possess a lien in the collateral in issue by virtue of a pledge of rents and had not commenced a foreclosure action and requested appointment of a receiver as of the time the bankruptcy case was commenced.

In both *Rief* and *Spears*, this court was concerned with disputes between the debtors and a creditor over entitlement to rents and profits rather than with a priority dispute between creditors. This court's agreement with the *Terpstra* analysis should be read narrowly. Clearly, the status of the state law regarding perfection of an interest created by a granting clause is not settled by virtue of the *Lower* court's observations. *See also* Iowa Code section 680.1 (appointment of a receiver). *Cf.* Iowa Code Chapter 654 (foreclosure of real estate mortgages). Note that Iowa Code Chapter 653 (foreclosure of pledges) was repealed by 61 G.A. Ch. 413, § 10102.

*Joint Stock Land Bank of Chicago v. Blount*, 223 Iowa 1339, 275 N.W. 64 (1937) requires the FLB to look first to the land to satisfy its claim before turning to the rents. First National points to the fact that most, if not all, of the FLB's claim is secured by farmland. In *Blount* the mortgage in question did not contain a granting clause conveyance of rents. Instead it contained a pledge of rents and profits and a provision for appointment of a receiver. Noting that the rents served as "secondary" security in such a case, the court ruled that rents cannot be utilized until the land is exhausted. *Id.* at 66. *Blount* is distinguishable from the present case because FLB's mortgage contains a conveyance of rents in the granting clause. The rents therefore serve as "primary" security for the indebtedness. Accordingly, the FLB is not required to exhaust the land first.

■ With respect to the equitable doctrine of marshalling, First National contends that where a senior lienor may reach two sources of funds but a junior lienor has recourse to only one, the court may order the senior lienor to exhaust the other fund first. First National cites *In re Jack Green's Fashions for Men—Big & Tall*, 597 F.2d 130 (8th Cir.1979) in support of its position. First National does not explain its argument in light of the undisputed facts. That is, it has an interest in more than the coal royalties. According to its proof of claim filed March 6, 1987, First National also claims to be secured by a blanket security agreement and real estate mortgages. Accordingly, the equitable doctrine of marshalling is not appropriate in this case.

C. *Do sections 544 and 551 operate to give the debtors a superior interest in royalties vis-a-vis First National?*

■ A Chapter 12 debtor has the same rights and powers of a trustee with certain exceptions not relevant here. 11 U.S.C. section 1203. The Hollinrakes argue that their status as hypothetical lien creditors under section 544 permits them to avoid the FmHA's unperfected interest in royalties. They further contend that section 551 pre-

serves the FmHA's avoided lien for the benefit of the estate ahead of First National because the FmHA received an assignment before Peoples received a similar assignment. First National responds by contending that a preserved lien is worthless since the FmHA's lien is inferior under state law to First National's lien. *See Connolly v. Marine Midland Bank*, 61 B.R. 748, 750 (W.D.N.Y.1986) ("if avoided lien would have been defeated by the junior claimants while in the hands of the lienholders, they are also vulnerable in trustee's").

First National bases its contention on Iowa Code section 558.41. Under First National's theory, the FmHA's assignment is invalid because it never recorded its mortgage with the county recorder. Also, First National claims it holds an assignment for valuable consideration and without notice of the FmHA's assignment. The Hollinrakes maintain that the FmHA's failure to record its mortgage is not fatal because First National's predecessor in interest, Peoples, had actual and constructive notice of the FmHA assignment. Affidavits submitted by the parties raise genuine issues of material fact concerning the notice issue. Thus, summary judgment is not appropriate with respect to this issue.

D. *Does section 552 entitle the debtors to royalties that accrued after the bankruptcy petition was filed?*

■ The Hollinrakes argue that the royalty liens of FLB and First National have no force and effect as to royalties that accrued after the filing date. The Hollinrakes rely on 11 U.S.C. section 552, which provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the

commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

This statutory scheme in essence means that a bankruptcy filing severs prepetition security interests with one important exception—security interests in property acquired prior to filing extend to proceeds of such property acquired by the estate after filing. The Hollinrakes maintain that the section 552(b) exception is inapplicable since FLB and First National did not have an assignment of the coal lease itself. The Hollinrakes seek to draw a distinction between an interest in a lease and an interest in rents that accrue under a lease. They imply that if these creditors had interests in the lease, then the creditors' liens would attach to postpetition rents because rents are specifically covered under section 552(b). The Hollinrakes theorize that an assignment of rents is a separate security interest not governed by section 552(b).

In support of their argument, the Hollinrakes cite *In re Jackels*, 55 B.R. 67 (Bankr. D.Minn.1985). In that case dairy farmers granted a lender a security interest in cows and assigned a portion of their monthly milk check to the lender. The court found that section 552(b) did not apply to a milk assignment because the assignment is a "separate independent security interest" distinct from the security interest in cows. *Id.* at 69. The court further observed that the bank did not present any evidence that the security interest in the cows covered products. However, the court concluded that milk was not a "product" as that term is used in a "security interest" context. *Id.* at 69.

A case more on point is *In re Oliver*, 66 B.R. 426 (Bankr.N.D.Tex.1986). There a bank held prepetition liens on land that the debtors leased postpetition to farmers on a cash and crop share basis. One of the questions before the court was whether the debtors were entitled to the rents pursuant to section 552(a). The debtors asserted that rents should be analogized to crops which if planted postpetition are not covered by prepetition liens. In rejecting this argument, the court stated:

> While the Debtors argue that it is illogical to allow them the benefits of postpetition crops they planted, but to deny them the benefits of postpetition rentals for crops grown on their property, the distinction between the two situations is clear. Postpetition crops are produced as a result of capital and labor invested by the Debtors postpetition and clearly constitute after-acquired property. On the other hand, rents are specifically mentioned in § 552(b) and are acquired by the Debtors as a result of ownership of property upon which the creditor has a lien. Minimal activity is expended by the Debtors in order to generate the rents. . . .

*Id.* at 428.

Section 552(b) applies to this case because FLB and First National acquired mortgages on property of the Hollinrakes prior to the bankruptcy filing. The mortgages contain granting clauses with respect to rents. As discussed earlier in this decision, the concept of rents includes royalties under Iowa law. Accordingly, it is not necessary to address the distinction raised by the Hollinrakes. Thus, the court concludes that the creditors liens are not cut off by section 552(a).

■ The Hollinrakes further argue that in the event the court rules that the creditors' prepetition liens extend to postpetition royalties, the court should limit the lien's effect under the "equities" clause of section 552(b). Although the above quoted language from the *Oliver* case casts some doubt on the merits of the Hollinrakes' argument, an equities determination under

§ 552(b) must be made on a case by case basis. *In re Vanas*, 50 B.R. 988, 997 (Bankr.E.D.Mich.1935). The court must balance "the expenditures of time, labor, and funds relating to the collateral, the relative position of the secured party, and the overall rehabilitative theme of bankruptcy law." *In re Lawrence*, 41 B.R. 36, 38 (Bankr.C.D.Minn.1984). Courts are more inclined to assist the debtor through the equity exception where the creditor whose interest is being modified is oversecured. *In re Groves Farms, Inc.*, 64 B.R. 276, 278 (Bankr.S.D.Ind.1986). Whether the equities of the case warrant curtailing the effect of the creditors liens raises a genuine issue of material fact.

## CONCLUSION AND ORDER

WHEREFORE, based upon the foregoing discussion, the court finds that:

1. The value of the 1339 acres and the 330 acres is $267,800.00 and $49,500.00 respectively and that any liens that exceed those values will be voided upon discharge;

2. The FLB's lien on the royalties attached upon execution of the December 31, 1974 mortgage;

3. The FLB's interest in the royalties is superior to that of First National;

4. The FLB is not required to exhaust the land before resorting to the royalties to satisfy its claim;

5. Whether the Hollinrakes' status as hypothetical lien creditors under 11 U.S.C. section 544 gives them a superior interest in the royalties vis-a-vis First National entails a genuine issue of material fact; and

6. Whether the equities of the case under 11 U.S.C. section 552(b) warrant curtailing or minimizing the effect of the FLB's and First National's liens in the royalties presents a genuine issue of material fact.

THEREFORE, the court orders that:

1. The Hollinrakes' motion for summary judgment is denied;

2. First National's cross-motion for summary judgment is denied; and

3. The FLB's cross-motion for summary judgment is granted.